**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **MARCIE BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )　　**Case No. 4:12CV172 LMB** |
| | ) |
| **CAROLYN W. COLVIN,[1]** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Marcie Brown for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 14).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 19).  Plaintiff has filed a Reply.  (Doc. No. 20).

**Procedural History**

On October 28, 2009, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, claiming that she became unable to work due to her disabling

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

condition on February 20, 2009.  (Tr. 131-43).  This claim was denied initially and, following an

administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law

Judge (ALJ), dated June 10, 2011.  (Tr. 60-64, 6-22).  Plaintiff then filed a request for review of

the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which

was denied on December 23, 2011.  (Tr. 1-5).  Thus, the decision of the ALJ stands as the final

decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

### Evidence Before the ALJ

**A.**     **ALJ Hearing**

Plaintiff's administrative hearing was held on May 17, 2011.  (Tr. 25).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Gary

Weimholt.  (Id.).

Plaintiff's attorney stated that plaintiff was alleging disability based on impairments of

diabetes mellitus,[2] peripheral neuropathy,[3] high blood pressure, and depression.  (Tr. 27).

Plaintiff's attorney argued that plaintiff meets the listing for depression.  (Id.).

The ALJ examined plaintiff, who testified that she was forty-six years of age, five-feet

one-inch tall, and weighed about 260 pounds.  (Tr. 28).

Plaintiff stated that she has a driver's license but does not drive.  (Id.).  Plaintiff testified

that she falls asleep easily due to sleep apnea.  (Tr. 29).  Plaintiff stated that she has fallen asleep

---

[2]A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma.  Stedman's Medical Dictionary, 529 (28th Ed. 2006).

[3]A syndrome of sensory loss, muscle weakness and atrophy, decreased deep tendon reflexes, and vascomotor symptoms, singly or in combination.  See Stedman's at 1313,

driving before, while she was waiting at a stop light.  (Id.).  Plaintiff testified that she last drove

about two years prior to the hearing.  (Id.).

Plaintiff stated that she graduated from high school and took some classes at a community

college.  (Id.).  Plaintiff testified that she just took some basic courses and did not earn a degree

or certificate.  (Tr. 30).

Plaintiff testified that she last worked in June of 2009.  (Id.).  Plaintiff stated that she

worked as a receptionist for Today's Staffing for approximately ten years.  (Id.).  Plaintiff stated

that she stopped working due to her diabetes, and because she was falling asleep on the job.  (Tr.

31).

Plaintiff testified that she worked a temporary job at the post office.  (Id.).

Plaintiff stated that she also had her own "private duty" business for three years, which

involved going to clients' homes and helping them with housework, cooking, and personal care.

(Tr. 32).  Plaintiff testified that she stopped performing this work in March of 2009 because she

was no longer able to lift clients.  (Id.).

Plaintiff testified that she was not able to work at the time of the hearing because her

diabetes is "bad," and she takes four insulin shots a day.  (Tr. 33).  Plaintiff testified that her high

blood pressure medication and antidepressant medications make her drowsy.  (Id.).  Plaintiff

stated that she also has neuropathy in her hands, legs, and feet.  (Id.).  Plaintiff testified that she

has difficulty holding items in her hands, and that her hands, feet, and legs go numb.  (Id.).

Plaintiff stated that she was diagnosed with neuropathy by Grace Hill Clinic.  (Id.).

Plaintiff testified that the neuropathy causes tingling, numbness, and pain in her hands and feet.

(Id.).

- 3 -

Plaintiff stated that she was taking the following medications at the time of the hearing: Neurontin,[4] Zyloprim,[5] insulin, Novolog,[6] Metformin,[7] Atenolol,[8] Lisinopril,[9] and antidepressants. (Tr. 33-34).  Plaintiff testified that she experiences drowsiness and diarrhea from her medications. (Tr. 34).

Plaintiff stated that she experiences pain in her legs, feet, and hands.  (Id.).  Plaintiff testified that she has difficulty walking due to pain in her feet.  (Id.).  Plaintiff stated that she also has difficulty sitting due to numbness and tingling.  (Id.).  Plaintiff testified that she has tried elevating her legs, but it did not help.  (Tr. 35).

Plaintiff stated that she has difficulty lifting.  (Id.).  Plaintiff testified that she is unable to lift a gallon of milk.  (Id.).  Plaintiff stated that she could climb one flight of stairs, but it would take her a long time to do so.  (Id.).

Plaintiff testified that she has difficulty with her memory.  (Id.).  Plaintiff stated that she often forgets to take her medication.  (Tr. 36).

---

[4]Neurontin is indicated for the treatment of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited September 9, 2013).

[5]Zyloprim is indicated for the treatment of kidney stones.  See WebMD, http://www.webmd.com/drugs (last visited September 9, 2013).

[6]Novolog is indicated to improve glycemic control in adults with diabetes mellitus.  See Physician's Desk Reference ("PDR"), 2359 (63rd Ed. 2009).

[7]Metformin is indicated to improve glycemic control in patients with type 2 diabetes.  See PDR at 3072.

[8]Atenolol is indicated for the treatment of hypertension.  See WebMD, http://www.webmd.com/drugs (last visited September 9, 2013).

[9]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2088.

Plaintiff testified that she "sometimes" has difficulty dealing with people.  (Id.).  Plaintiff stated that she occasionally does not want to be bothered, even by her children, and she sits in a dark room by herself.  (Id.).

Plaintiff testified that, on a typical day, she stays in bed.  (Id.).  Plaintiff stated that she lives with her three sons, who are aged twenty-six, twenty, and seventeen.  (Id.).  Plaintiff testified that her sons do most of the household chores.  (Id.).  Plaintiff testified that she does not do laundry, sweep, or mop.  (Id.).  Plaintiff stated that she makes sandwiches, but does not cook.  (Id.).  Plaintiff testified that she has difficulty sleeping.  (Tr. 37).  Plaintiff stated that she has no hobbies, and that she does not have the drive to do anything.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she has been suffering from depression since February of 2009.  (Id.).  Plaintiff's attorney noted that plaintiff had been tearful during the hearing.  (Id.).  Plaintiff testified that she experiences multiple crying spells on a daily basis.  (Tr. 38).  Plaintiff stated that she spends a lot of time alone in a dark room.  (Id.).  Plaintiff testified that she has no interest in any activities or hobbies, and she watches very little television.  (Id.).

Plaintiff's attorney noted that plaintiff had gotten up several times during the hearing.  (Id.).  Plaintiff stated that she had gotten up because her leg had fallen asleep and her feet hurt.  (Id.).  Plaintiff testified that she alternates between sitting and standing every ten to fifteen minutes throughout a typical day, just as she was doing during the hearing.  (Id.).  Plaintiff stated that she also lies down occasionally during the day.  (Tr. 39).

Plaintiff testified that she has difficulty with her balance, especially when her blood sugar levels are low.  (Id.).  Plaintiff stated that she monitors her blood sugar levels, and that they

typically run higher than normal, even with insulin.  (Id.).

Plaintiff testified that she is able to walk about one-and-a-half blocks before she has to sit down and rest due to pain in her feet.  (Tr. 40).

Plaintiff stated that she worked for a few months after her alleged onset of disability date. (Id.).  Plaintiff testified that she attempted to return to work to see if she was able to work.  (Id.). Plaintiff stated that she worked the private duty job on the weekends, at the same time she was working as a receptionist.  (Id.).  Plaintiff testified that she worked seven days a week.  (Id.).

Plaintiff stated that she has some difficulty stooping, kneeling, and bending.  (Tr. 40-41).

Plaintiff testified that she has difficulty using her hands.  (Tr. 41).  Plaintiff stated that she is unable to grip a pen to write a letter because her fingers tingle and become numb.  (Id.). Plaintiff testified that she is unable to work on a computer for the same reason.  (Id.).  Plaintiff rated her neuropathy pain as a ten on a scale of one to ten.  (Id.).

Plaintiff testified that she has high blood pressure, and that she has not had any complications resulting from this impairment.  (Id.).

Plaintiff stated that she does not have health insurance, and that she relies on free clinics to provide her medical care.  (Tr. 42).  Plaintiff testified that she recently started seeing a psychiatrist.  (Id.).

Plaintiff's attorney noted that plaintiff's left hand had been trembling during the hearing. (Id.).  Plaintiff testified that her hand was swollen and it hurt.  (Id.).  Plaintiff stated that this occurred frequently.  (Id.).

The ALJ re-examined plaintiff, who testified that a friend drove her to the hearing.  (Tr. 43).

- 6 -

Plaintiff stated that she does not watch much television because she goes to sleep, and because she does not want to do anything.  (Id.).

The ALJ examined vocational expert Gary Weimholt, who testified that plaintiff's past work was classified as: home attendant (medium, semi-skilled); and receptionist (sedentary, semi-skilled).  (Tr. 45).

The ALJ asked Mr. Weimholt to assume a hypothetical claimant with plaintiff's background and the following limitations: capable of performing sedentary work; and requires a sit/stand option every half-hour, while remaining on task.  (Tr. 46).  Mr. Weimholt testified that he did not have information regarding how plaintiff performed her past job as a receptionist, although there are receptionist jobs that allow for brief periods of standing after thirty minutes of work.  (Id.).  Mr. Weimholt testified that approximately ten percent of receptionist jobs in the State, or 2,000 jobs, would allow this.  (Tr. 47).  Mr. Weimholt stated that the individual would be able to perform other work, such as information clerk (60,000 jobs nationally; 1,200 jobs in the State); and pharmaceuticals packaging jobs (60,000 jobs nationally; 1,200 jobs in the State).  (Tr. 47-48).

The ALJ next asked Mr. Weimholt to assume the same limitations as the first hypothetical, with the additional limitation of performing only simple, repetitive tasks.  (Tr. 48).  Mr. Weimholt testified that the individual would be unable to perform the receptionist job, or the information clerk jobs, but would be capable of performing the packaging job.  (Id.).

The ALJ then asked Mr. Weimholt to assume the limitations contained in the first two hypotheticals, with the additional limitation of frequent handling and fingering.  (Id.).  Mr. Weimholt testified that the DOT indicates that the packaging job requires frequent handling and

- 7 -

fingering, although in his opinion it requires near continual use of the fingers for fine dexterity.
(Id.).  Mr. Weimholt stated that there are no other jobs in the regional or national economy that
such a person could perform.  (Tr. 49).

**B.**     **Relevant Medical Records**

Plaintiff received treatment at People's Health Centers ("People's") from April 2007
through June 2009.  (Tr. 295-96).  In April 2007, plaintiff was treated for diagnoses of
depression, hypertension, hyperpigmentation, and obesity.  (Tr. 295).  In March 2008, plaintiff
was diagnosed with obstructive sleep apnea.[10]  (Id.).

Plaintiff was admitted at Barnes-Jewish Hospital from February 17, 2009, through
February 20, 2009, with diagnoses of hyperosmolar hyperglycemic state,[11] diabetes mellitus type
2,[12] and hypertension.  (Tr. 250).  Upon discharge, plaintiff was prescribed Lantus.[13]  (Tr. 251).

Plaintiff presented to People's on February 26, 2009, for follow-up after her
hospitalization.  (Tr. 304).  Plaintiff was diagnosed with new onset diabetes mellitus, well-
controlled hypertension, obesity, and obstructive sleep apnea.  (Tr. 305).  Plaintiff was started on
Metformin.  (Id.).  On March 5, 2009, plaintiff complained of blurry vision.  (Tr. 306).  Plaintiff

---

[10]A disorder characterized by recurrent interruptions of breathing during sleep, due to
temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues,
with resultant hypoxemia and chronic lethargy.  See Stedman's at 119.

[11]A complication of diabetes mellitus marked by elevation of blood glucose,
hyperosmolarity (increased osmotic concentration of a solution), and little or no ketosis (enhanced
production of ketone bodies).  See Stedman's at 920.

[12]Type II diabetes mellitus is characterized by insulin resistance in peripheral tissues as
well as a defect in insulin secretion by beta cells.  Stedman's at 529.

[13]Lantus is indicated for the treatment of patients with type 2 diabetes mellitus who require
long-acting insulin for the control of hyperglycemia.  See PDR at 2750.

was diagnosed with uncontrolled diabetes mellitus II.  (Tr. 307).  Plaintiff's medications were adjusted, and plaintiff was referred to a dietician and a podiatrist.  (Id.).  On April 9, 2009, it was noted that plaintiff's diabetes needed better control.  (Tr. 314).  Plaintiff's medications were adjusted.  (Id.).

On September 2, 2009, plaintiff presented to the emergency room at Barnes-Jewish Hospital with complaints of abdominal pain and vomiting.  (Tr. 276).  Plaintiff was discharged on September 3, 2009, with a diagnosis of improved abdominal pain, and was instructed to contact her primary doctor if her symptoms returned.  (Tr. 272).

Plaintiff presented to People's on September 10, 2009, with complaints of diabetes mellitus, hypertension, obesity, abdominal discomfort, gallstones, and hyperlipidemia.[14]  (Tr. 418).  It was noted that plaintiff's hypertension and diabetes mellitus were controlled, and plaintiff's gallstones had resolved.  (Id.).  Upon examination, mild paresthesia was noted in plaintiff's hands.  (Tr. 419).

Plaintiff saw an endocrinologist at St. Louis ConnectCare ("ConnectCare") between April 2009 and April 2011 for treatment of her diabetes.  (Tr. 324-482).

Plaintiff presented to People's on February 11, 2010, at which time she complained of some symptoms of peripheral neuropathy, including tingling and numbness of the hands and lower legs.  (Tr. 424).  Plaintiff's medications were continued and she was counseled about weight loss and diet control.  (Tr. 426).

Plaintiff saw psychologist Dianna Moses-Nunley, Ph.D. on March 24, 2010, for a psychological evaluation at the request of the state agency.  (Tr. 337-40).  Plaintiff reported that

---

[14]Elevated levels of lipids in the blood plasma.  Stedman's at 922.

she was unable to work due to diabetes that resulted in neuropathy in her hands, feet, and legs; and sleep apnea. (Tr. 337). Plaintiff also reported depression due to her health problems and inability to do the things she used to do. (Id.). Plaintiff indicated that her depression started out as mild around January of 2009 and became pronounced when she was diagnosed with diabetic neuropathy in February 2009. (Id.). Plaintiff reported mood swings, frequent sadness with tearfulness that comes and goes, feeling bad about herself, lack of interest or enjoyment in activities, difficulty staying asleep, lack of appetite, and feelings of self-blame and guilt. (Id.). Upon mental status examination, plaintiff had a forlorn expression and manner, she answered questions fairly well without any difficulty communicating her ideas, her speech was coherent and stayed on track, no abnormalities of her mental flow of speech or thought content were observed or reported, she described her mood as depressed, and she was tearful and seemed very sad throughout the interview. (Tr. 338). Plaintiff reported that she lived on her own and was mentally able to maintain her household as far as cooking, cleaning, shopping, and paying bills. (Tr. 339). The ALJ found that plaintiff's impairment in her activities of daily living was mild to moderate, her social functioning impairment was mild, and she had no impairment in her self-care abilities. (Id.). Plaintiff reported difficulty concentrating on what people are saying if it is long, decreased concentration since her depression began, and slowed pace for mental activities such as thinking and talking. (Id.). Dr. Moses-Nunley diagnosed plaintiff with major depressive disorder,[15] single episode, moderate, bereavement; and a GAF score of 57.[16] (Tr. 340). Dr.

_____

[15]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[16]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

Moses-Nunley stated that plaintiff's depression appears to impair her motivation, interest, energy, pace, and concentration to a degree that would be problematic in a work setting.  (Tr. 340). Plaintiff did not appear to have difficulty with understanding tasks but would likely experience problems keeping up with her work load, remembering and concentrating on what she has to do, and handling the normal stressors of many work settings.  (Id.).  Dr. Moses-Nunley stated that plaintiff's difficulties would likely improve as her depression remits.  (Id.).  Dr. Moses-Nunley stated that plaintiff would benefit from treatment for her depression, and noted that plaintiff's comprehension literacy, judgment, and calculation ability is sufficient for her to independently manage her funds and business affairs.  (Id.).

Plaintiff saw neurologist Patrick A. Hogan, M.D. for a consultative examination on March 24, 2010.  (Tr. 344-46).  Plaintiff reported numbness in her fingertips and her toes with difficulty in walking, unsteadiness, and occasional falls on uneven ground.  (Tr. 344).  Upon neurological examination, plaintiff was noted to be morbidly obese, and moaned and sighed continually through the examination.  (Tr. 345).  Plaintiff had normal strength in all four extremities and full range of motion in the neck.  (Id.).  Plaintiff's sensory examination revealed diminished pinprick sensation to the metacarpal phalangeal joints and diminished sensation above the ankles bilaterally; touch was diminished in these areas.  (Id.).  Plaintiff had trace deep tendon reflexes in the upper extremity, and absent deep tendon reflexes in the knees and ankles.  (Id.).  Dr. Hogan's gait examination revealed a moderately wide-based gait.  (Id.).  Plaintiff had difficulty walking heel-to-toe, she could walk a few steps on her toes and heels but stated it produced weakness in her legs.

---

school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

(Id.).  Dr. Hogan stated that plaintiff has insulin-dependent diabetes mellitus by history as well as mild peripheral neuropathy with unsteadiness of gait; and sleep apnea by history.  (Id.).

State agency psychologist Kyle DeVore, Ph.D. completed a Psychiatric Review Technique on March 31, 2010, in which he expressed the opinion that plaintiff's mental impairments were not severe and caused mild limitations in plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace.  (Tr. 359).

Plaintiff presented to ConnectCare on July 8, 2010, with complaints of tingling of her hands and feet.  (Tr. 477).  Plaintiff stated that her feet "feel like sponges."  (Id.).

On July 13, 2010, state agency physician Dennis McGraw, D.O. authored a Case Analysis, in which he expressed the opinion that there was no supportive evidence to show any worsening of plaintiff's impairments since a prior decision dated April 7, 2010.  (Tr. 378).

State agency psychologist Robert Cottone, Ph.D. completed a Psychiatric Review Technique on July 23, 2010, in which he expressed the opinion that plaintiff had mild limitations in her activities of daily living, moderate difficulties in her ability to maintain social functioning, and moderate difficulties in her ability to maintain concentration, persistence, or pace.  (Tr. 387).

Dr. Cottone also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was markedly limited in her ability to understand and remember detailed instructions, and carry out detailed instructions; and moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately

with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 391-92). In his functional capacity assessment, Dr. Cottone stated that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, and close proximity to co-workers. (Tr. 393). Dr. Cottone stated that plaintiff is able to understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Id.).

Plaintiff began treatment at Grace Hill on March 26, 2011, at which time she reported complaints of depression, swelling, and diabetes. (Tr. 408). Plaintiff indicated that she was feeling sad, had no enjoyment in life, and was hopeless. (Id.). Plaintiff requested medication. (Id.). Plaintiff also complained of paresthesia of her hands and feet. (Id.). Upon examination, no edema or foot lesions were noted, and plaintiff's plantar sensation was intact. (Id.). Plaintiff was diagnosed with depressive disorder, not otherwise classified, and was started on Celexa.[17] (Id.). Plaintiff was also referred to a neurologist. (Id.).

On April 11, 2011, plaintiff presented to Grace Hill with complaints of diabetes and numbness in her feet. (Tr. 406). Upon examination, plaintiff's foot strength was normal bilaterally. (Tr. 407). Plaintiff was diagnosed with diabetes with neurological manifestations, type II; and polyneuropathy[18] in diabetes. (Id.). Plaintiff was prescribed Neurontin. (Id.). On April 20, 2011, plaintiff complained of numbness and tingling in her bilateral legs and hands. (Tr. 403). Plaintiff's depression was unchanged since her last visit. (Id.). Upon examination, plaintiff

_____

[17]Celexa is indicated for the treatment of depression. See PDR at 1161.

[18]A disease process involving a number of peripheral nerves. Stedman's at 1536.

- 13 -

had no edema of the extremities, and plaintiff's affect was appropriate.  (Id.).  Plaintiff's dosage of

Celexa was increased.  (Tr. 404).  On April 25, 2011, plaintiff complained of depression and

reported that it was difficult to meet home, work, or social obligations.  (Tr. 443).  Plaintiff was

experiencing anxious, fearful thoughts; depressed mood; diminished interest or pleasure; fatigue

or loss of energy; feelings of guilt or worthlessness; panic attacks; poor concentration;

indecisiveness; restlessness or sluggishness; significant change in appetite; sleep disturbance and

thoughts of death or suicide.  (Id.).  It was noted that plaintiff had the symptoms of a major

depressive episode.  (Id.).  Plaintiff was diagnosed with recurrent major depression, with a GAF

score of 40.[19]  (Tr. 444).

## C.   Evidence Submitted to the Appeals Council

Plaintiff continued to receive treatment for her diabetes at ConnectCare through August

2011.  (Tr. 486-500).  In January 2011, plaintiff complained of tingling in her legs, hands, and

feet; losing her balancing and falling; and feeling tired and depressed.  (Tr. 535).

In May 2011, plaintiff complained of tingling and numbness in her hands and feet that was

present constantly.  (Tr. 492).  Plaintiff reported that her hand became weak and numb when she

tried to hold a pen to write; and that she frequently dropped items.  (Id.).  Plaintiff reported that

she had to lean against the wall in the shower because she was unsteady on her feet.  (Id.).  The

following findings were noted on examination: plaintiff was falling asleep during the visit, edema

of the lower extremities bilaterally, decreased response to pain and temperature stimulation

---

[19]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in
several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,
depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

gradient in hands and feet, decreased response to stimulation by vibration, Romberg's sign[20] was present, heel walking was abnormal, toe walking was abnormal, tandem gait test was abnormal, and plaintiff was tearful and anxious.  (Tr. 494).  Plaintiff was diagnosed with diabetic polyneuropathy.  (Id.).

On August 12, 2011, plaintiff complained of depression, and pain in her legs and feet.  (Tr. 486).  Plaintiff reported numbness and tingling in her hands and feet that occurs throughout the day, and noted that her dosage of Neurontin had recently been increased.  (Id.).  Upon examination, positive Phalen's maneuver[21] in the left hand was noted, Romberg's sign was present, and plaintiff's tandem gait test showed abnormalities.  (Tr. 488).  Plaintiff was diagnosed with diabetic peripheral neuropathy, carpal tunnel syndrome,[22] myelopathy,[23] and diabetic polyneuropathy.  (Id.).  Plaintiff's Neurontin was increased.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

---

[20]When a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed.  Stedman's at 1771.

[21]Maneuver in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within sixty seconds may indicate carpal tunnel syndrome. Stedman's at 1151.

[22]The most common nerve entrapment syndrome, characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand. Stedman's at 1892.

[23]Disorder of the spinal cord occurring as a complication of diabetes mellitus.  Stedman's at 1270.

2. The claimant has not engaged in substantial gainful activity since February 20, 2009, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: diabetes with neuropathy and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work except she requires a sit/stand option while remaining on tasks every half-hour and is limited to performing simple, repetitive tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 21, 1964 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 20, 2009 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-16).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on October 28, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

> Based on the application for supplemental security income filed on October 28, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 16).

## Discussion

A.      **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See

- 19 -

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities.  See id.  Next, the Commissioner must determine the severity of the impairment

based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    **Plaintiff's Claims**

Plaintiff raises several claims that relate to the ALJ's RFC determination.  Specifically,

plaintiff contends that the ALJ's determination is not supported by substantial evidence, the ALJ

did not provide a narrative discussion, the ALJ failed to discuss the weight assigned to the

medical opinions, and the ALJ failed to properly evaluate plaintiff's depression.  Plaintiff also

argues that the ALJ erred in relying on vocational expert testimony that was not supported by

substantial evidence.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, I find that the claimant has the
residual functional capacity to perform sedentary work except she requires a
sit/stand option while remaining on tasks every half-hour and is limited to
performing simple, repetitive tasks.

(Tr. 12).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff contends that the ALJ did not cite any medical evidence in support of her RFC determination, and that the ALJ erred in excluding any limitations resulting from plaintiff's diabetic neuropathy.  Plaintiff also argued that the ALJ erred in determining plaintiff's mental RFC.

The undersigned finds that the ALJ erred in determining plaintiff's RFC.  With regard to plaintiff's physical impairments, the ALJ acknowledged that consultative neurologist Dr. Hogan had noted findings of mild peripheral neuropathy and unsteadiness of gait during his March 2010 examination.  (Tr. 14, 345).  The ALJ also noted that plaintiff was diagnosed with polyneuropathy and was prescribed Neurontin at Grace Hill in April 2011.  (Tr. 14, 407).  The ALJ, however, did not include any limitations resulting from plaintiff's peripheral neuropathy in plaintiff's RFC.

- 21 -

The ALJ also failed to discuss any of plaintiff's treatment notes from ConnectCare. Plaintiff saw an endocrinologist at ConnectCare for treatment of her diabetes from April 2009 through April 2011.  In October 28, 2009, plaintiff reported tingling in both hands and feet.  (Tr. 324).  On July 8, 2010, plaintiff complained of tingling in her hands and feet, and reported that her feet felt like "sponges."  (Tr. 477).  Plaintiff's treatment notes from ConnectCare reveal that plaintiff experienced significant symptoms resulting from her diabetic neuropathy.  Plaintiff submitted additional records from ConnectCare to the Appeals Council, dated January 2011 through August 2011, which demonstrate that plaintiff continued to report symptoms of diabetic neuropathy and that evidence of neuropathy was noted on examination.  (Tr. 535, 492-94, 486).

The ALJ erred in failing to incorporate limitations in plaintiff's RFC arising from diabetic neuropathy.  The treatment notes from plaintiff's treating endocrinologist at ConnectCare, treating providers at Grace Hill, and consultative neurologist all support the presence of symptoms of peripheral neuropathy.  It is questionable whether plaintiff would be capable of using her hands repetitively in a work setting due to the symptoms of peripheral neuropathy noted in the medical record.  None of plaintiff's treating or examining physicians expressed an opinion as to plaintiff's work-related limitations.  "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment."  Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009).

The ALJ's finding that plaintiff is capable of performing the physical demands of sedentary work except that she requires a sit/stand option while remaining on tasks every half-hour is not

- 22 -

supported by substantial evidence.  It is significant that the vocational expert testified that, if plaintiff had the additional limitation of only frequent handling and fingering, there would likely by no jobs in the regional or national economy that plaintiff could perform.  (Tr. 48-49).

Plaintiff also contends that the ALJ erred in determining plaintiff's mental RFC.  The ALJ limited plaintiff to performing simple, repetitive tasks as a result of her depression.  (Tr. 13).   As support for this finding, the ALJ noted that plaintiff did not obtain treatment for depression until more than two years after her alleged onset of disability date.  (Tr. 14).  The ALJ also pointed out that Dr. Moses-Nunley assessed a GAF score of 57 in March 2010, before plaintiff began psychiatric treatment with medication and therapy.  (Id.).

The ALJ's mental RFC is not supported by substantial evidence.  While it is true that plaintiff did not seek psychiatric treatment and medication until March 2011, plaintiff complained of depression to providers at People's Health Center in April 2007.  (Tr. 295).  In addition, as noted by the ALJ, Dr. Moses-Nunley diagnosed plaintiff with major depressive disorder, with a GAF score of 57 in March 2010.  (Tr. 340).  Dr. Moses-Nunley stated that plaintiff's depression appeared to impair her motivation, interest, energy, pace, and concentration to a degree that would be problematic in a work setting.  (Id.).  Dr. Moses-Nunley also found that plaintiff's difficulties would "likely improve as her depression remits," and noted that plaintiff would benefit from treatment for her depression  (Id.).

Plaintiff began receiving psychiatric treatment at Grace Hill in March, 2011.  (Tr. 408). At that time, plaintiff reported feeling sad, had no enjoyment in life, and was hopeless.  (Id.). Plaintiff was diagnosed with depressive disorder and was started on Celexa.  (Id.).  On April 20, 2011, plaintiff reported that her depression was unchanged.  (Tr. 403).  Plaintiff's dosage of

Celexa was increased.  (Tr. 404).  On April 25, 2011, plaintiff complained of depression and reported that it was difficult to meet home, work, or social obligations.  (Tr. 443).  Plaintiff complained of anxious, fearful thoughts; depressed mood; diminished interest of pleasure; fatigue or loss of energy; feelings of guilt or worthlessness; panic attacks; poor concentration; indecisiveness; restlessness or sluggishness; significant changes in appetite; sleep disturbance; and thoughts of death or suicide.  (Id.).  Plaintiff was diagnosed with recurrent major depression, and a GAF score of 40.  (Tr. 444).  This evidence reveals that, despite the ALJ's finding to the contrary, plaintiff continued to experience significant psychiatric symptomatology even with treatment and medication.

The only other opinion evidence regarding plaintiff's mental impairment is that of state agency psychologist Dr. Cottone.  The ALJ did not indicate the weight he was assigning to this opinion.  Dr. Cottone completed a Psychiatric Review Technique on July 23, 2010, in which he expressed the opinion that plaintiff had mild limitations in her activities of daily living, moderate difficulties in her ability to maintain social functioning, and moderate difficulties in her ability to maintain concentration, persistence, or pace.  (Tr. 387).  Dr. Cottone also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, and close proximity to co-workers.  (Tr. 393).  Dr. Cottone expressed his opinion prior to plaintiff's psychiatric treatment.  Dr. Cottone still, however, found greater mental limitations than those found by the ALJ.  The ALJ did not incorporate any social limitations, despite Dr. Cottone's finding that plaintiff had moderate difficulty in her ability to maintain social functioning.

- 24 -

## Conclusion

In sum, the undersigned finds that the ALJ erred in determining plaintiff's residual functional capacity.  Specifically, the ALJ failed to include any limitations resulting from plaintiff's peripheral neuropathy, and formulated a mental residual functional capacity that was unsupported by the record.  The hypothetical question posed to the vocational expert was based on this erroneous residual functional capacity.  Consequently, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider the effect of plaintiff's peripheral neuropathy on plaintiff's residual functional capacity; consider the medical evidence of record regarding plaintiff's mental impairment; reassess plaintiff's residual functional capacity based on the medical evidence and, if necessary, obtain additional medical evidence addressing plaintiff's ability to function in the workplace; and obtain vocational expert testimony to determine whether plaintiff is capable of performing work existing in significant numbers in the national economy with her residual functional capacity.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  9th  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 25 -